# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**March 16, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

CECIL GRAY JACKSON, )
)
    Plaintiff/Appellant, ) Stewart Chancery
) No. 96-7-221
VS. )
)
CHRISTINE FUTRELL and ) Appeal No.
TAMMY FUTRELL DUNAWAY, ) M1999-01046-COA-R3-CV
)
    Defendant/Appellee. )


## APPEAL FROM THE CHANCERY COURT FOR STEWART COUNTY
## AT DOVER, TENNESSEE


## THE HONORABLE ALLEN W. WALLACE, JUDGE


Attorney for Plaintiff/Appellant:

Robert H. Moyer
Sykes, Moyer & Smith
Clarksville, Tennessee

Attorney for Defendant/Appellee:

Markley Runyon Gill
Erin, Tennessee


## AFFIRMED AND REMANDED


WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a dispute between siblings over real property their father unexplainedly conveyed to each of them in separate conveyances. After their father's death, the son filed suit in the Chancery Court for Stewart County against his sister and niece seeking to quiet title on the piece of property his father had conveyed to him after he had already conveyed it to his sister and niece. Following a bench trial, the trial court dismissed the son's complaint because he had failed to prove that his sister or niece had committed fraud or exerted undue influence on their father. The son asserts on this appeal that the trial court erred by excluding testimony regarding the father's state of mind and excluding other testimony based on the clergy-penitent privilege. We affirm the judgment because this record provides us no basis for concluding that the trial court committed reversible error.

## I.

On May 8, 1987, Theodore Jackson executed a deed conveying a fee simple interest in all his real property to his daughter, Christine Futrell, and his granddaughter, Tammy Futrell Dunaway (then Tammy Futrell), and reserving a life estate for himself. Mses. Futrell and Dunaway each received a one-half interest in the conveyed property. This deed was recorded on the same day that it was executed. Approximately five years later, Mr. Jackson joined Mses. Futrell and Dunaway in a deed conveying the timber rights on six of the tracts of property that Mr. Jackson had conveyed to Mses. Futrell and Dunaway in 1987.

On July 12, 1993, Mr. Jackson executed another deed purporting to convey 62.64 acres of land known as the Odom Farm to his son, Cecil Gray Jackson. This deed was likewise recorded. Even though the deeds are not entirely clear, all parties now agree that the property Mr. Jackson conveyed to his son in 1993 was also part of the property he conveyed to his daughter and granddaughter in 1987.[1]

Theodore Jackson died testate in 1995. His will purported to leave the Odom Farm to his son even though he had undertaken to convey it to his son in 1993. In 1996, Cecil Jackson filed suit in the Chancery Court for Stewart County seeking to quiet the title to the

---

[1]It is difficult to confirm this from the physical descriptions of the property conveyed in the deeds of May 8, 1987 and July 12, 1993. However, both deeds purport to convey property originally conveyed to Theodore Jackson and his wife, Ray Jackson, as recorded in Volume 165, Page 563, Register's Office for Stewart County, Tennessee. The first deed appears to convey all of this property to Mses. Futrell and Dunaway. The second purports to convey "a portion" of it.

Odom Farm. He alleged that Mses. Futrell and Dunaway had procured the 1987 conveyance from Mr. Jackson through fraud and undue influence.

The trial court heard the evidence without a jury in May 1999. During the trial, the trial court either limited or excluded the hearsay testimony of various witnesses attempting to prove that Theodore Jackson thought he still owned the Odom Farm and that he intended to give it to his son. These witnesses included: (1) Gary Hodges, the lawyer who prepared the 1993 deed purporting to convey the Odom Farm to Cecil Jackson;[2] (2) the Reverend Jerry Moore, Theodore Jackson's friend and pastor who had introduced Mr. Jackson to Mr. Hodges;[3] (3) Cecil Jackson;[4] and (4) several other potential witnesses who were prepared to recount Mr. Jackson's stated intentions regarding the property. Cecil Jackson's lawyer decided that it would be pointless to call these witnesses after the trial court determined that this type of evidence was inadmissible.

The trial court ruled from the bench after both parties rested their cases. After referring to the case as "probably the most paradoxical case I've heard in a long time," the trial court concluded that Mses. Futrell and Dunaway had title to the property because their deed preceded Mr. Jackson's. The trial court also determined that Mr. Jackson had failed to prove that Mses. Futrell and Dunaway had exerted undue influence on Theodore Jackson or that they had used his power of attorney improperly. In the trial court's words, ". . . there's just not proof in this case to set aside that delivery and first to the courthouse. There's just not sufficient proof here. The motion to dismiss is sustained."

## II.

Mr. Jackson's appeal involves two evidentiary issues. The first issue relates to the trial court's refusal to permit Mr. Jackson to present evidence regarding his father's state of mind and intentions regarding the disposition of the Odom Farm. The second issue involves the

---

[2]The court sustained an objection to Mr. Hodges' testimony that when Theodore Jackson was preparing to execute the 1993 deed he "said he had this farm and that he had promised it to his son, Cecil, years ago." When counsel attempted to elicit testimony from Mr. Hodges concerning whether Theodore Jackson knew he had already transferred the Odom Farm, the court sua sponte cut off the testimony.

[3]The court restricted Rev. Moore's testimony concerning to whom Theodore Jackson said he intended to give his property.

[4]Counsel asked Cecil Jackson whether Theodore Jackson "ever express[ed] to [Cecil Jackson] a plan as to how he wanted those various tracts to go amongst the members of your family?" The trial court sustained opposing counsel's objection.

trial court's admonition of a witness regarding the law relating to the clergy-penitent privilege.

## A.
### STANDARD OF REVIEW

Appellate courts review decisions concerning the admission or exclusion of evidence using the "abuse of discretion" standard of review. *See Dockery v. Board of Prof'l Responsibility*, 937 S.W.2d 863, 866 (Tenn. 1996); *Miller v. Alman Constr. Co.*, 666 S.W.2d 466, 468 (Tenn. Ct. App. 1983). This standard implicitly recognizes the existence of a range of permissible alternatives. It is intended to be a review constraining concept implying less intense appellate review and, therefore, less likelihood of reversal. *See BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed).

An erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted. *See Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987). Reviewing courts cannot make this determination without knowing what the excluded evidence would have been. *See Stacker v. Railroad*, 106 Tenn. 450, 452, 61 S.W. 766, 766 (1901); *Davis v. Hall*, 920 S.W.2d 213, 218 (Tenn. Ct. App. 1995); *State v. Pendergrass*, 795 S.W.2d 150, 156 (Tenn. Crim. App. 1989). Accordingly, the party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered evidence was reversible error. *See* Tenn. R. Evid. 103(a)(2); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986); *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991). Appellate courts will not consider issues relating to the exclusion of evidence when this tender of proof has not been made. *See Austin v. City of Memphis*, 684 S.W.2d 624, 628 (Tenn. Ct. App. 1984); *Home Ins. Co. v. Glen Falls Ins. Co.*, 675 S.W.2d 486, 488 (Tenn. Ct. App. 1984).

An offer of proof must contain the substance of the evidence and the specific evidentiary basis supporting the admission of the evidence. *See* Tenn. R. Evid. 103(a)(2). These requirements may be satisfied by presenting the actual testimony, by stipulating the content of the excluded evidence, or by presenting an oral or written summary of the excluded evidence. *See* Neil P. Cohen, et al. *Tennessee Law of Evidence* § 103.4, at 20 (3d ed. 1995). An offer of proof is not required when the substance of the evidence is apparent from the context, *see* Tenn. R. Evid. 103(a)(2), or when the trial court's refusal to allow further evidence affects the fairness of the proceedings. *See First Nat'l Bank & Trust Co. v.*

*Hollingsworth*, 931 F.2d 1295, 1305 (8th Cir. 1991); *Blankenship v. Blankenship*, No. 02A01-9603-CH-00051, 1997 WL 15241, at *3 (Tenn. Ct. App. Jan. 17, 1997) (No Tenn. R. App. P. 11 application filed).

## B.
### EVIDENCE REGARDING THEODORE JACKSON'S STATE OF MIND

Mr. Jackson takes issue with the trial court's decision against permitting him to elicit testimony regarding his father's state of mind between 1989 when he executed his will leaving the Odom Farm to Mr. Jackson and 1993 when he undertook to convey the Odom Farm to his son. We cannot consider this issue on its merits because Mr. Jackson's lawyer did not make a tender of proof regarding what Mr. Hodges, the Reverend Moore, Mr. Jackson himself, and other witnesses would have testified to had the trial court permitted them to testify regarding this matter and because the record does not permit us to divine what that testimony might have been.

Even if Mr. Jackson's lawyer had made a proper tender of proof, we fail to discern how evidence regarding Theodore Jackson's state of mind between 1989 and 1993 would have been relevant. Theodore Jackson conveyed all his real property to Mses. Futrell and Dunaway in May 1987. By this act, he left himself with no legal or equitable interest in the property other than the life estate he kept for himself that was reflected in the deed. Theodore Jackson's 1993 attempt to convey greater title to the Odom Farm than he had at the time was of no legal effect, notwithstanding his intentions at the time. *See Lisenbee v. Parr*, 62 Tenn. App. 518, 525, 465 S.W.2d 361, 365 (1970); *Branstetter v. Poynter*, 32 Tenn. App. 189, 199, 222 S.W.2d 214, 218 (1949). Accordingly, the testimony should have been excluded in accordance with Tenn. R. Evid. 401, 402 because it is simply irrelevant.

## C.
### THE CLERGY-PENITENT PRIVILEGE

Mr. Jackson also takes issue with the trial court's decision to explain the operation of the clergy-penitent privilege in Tenn. Code Ann. § 24-1-206 (Supp. 1999) to the Reverend Moore. Essentially, he contends that the trial court abdicated its role as arbiter of whether clergy-penitent privilege applied by leaving it up to the Reverend Moore to decide whether to answer the questions posed to him. Moreover, Mr. Jackson intimates that the trial court improperly intimidated the Reverend Moore into silence by explaining to him the operation of Tenn. Code Ann. § 24-1-206.

Mr. Jackson's lawyer asked the Reverend Moore whether Theodore Jackson ever confided in him about his relationship with his children. Recognizing that the Reverend Moore was Theodore Jackson's close personal friend as well as his pastor, the trial court explained the substance of Tenn. Code Ann. § 24-1-206 to the Reverend Moore and asked him whether he could distinguish information he received from Mr. Jackson as a friend from information Mr. Jackson imparted to the Reverend Moore because he was his pastor. The Reverend Moore replied that it would be hard for him to differentiate between information he received as a pastor and information he received as a friend because he "was always Pappy's friend, but I think that I was always Pappy's pastor also." Mr. Jackson's lawyer moved on to other matters after the Reverend Moore stated that he would prefer not to answer questions on what Theodore Jackson had confided to him regarding his children.

The purpose of an evidentiary privilege is to protect certain types of communications from disclosure. These communications generally include confidential communications between individuals whose relationship is found to have such social significance that its protection is more important than the information the privilege keeps from the trier of fact. *See* Neil P. Cohen, *Tennessee Law of Evidence* § 501.3, at 261 (3d ed. 1995). By enacting Tenn. Code Ann. § 24-1-206, the General Assembly has determined that communications between individuals and their clergy merit protection from disclosure.

Communications between an individual and a member of the clergy are privileged even if the member of the clergy is both the individual's minister and close personal friend. *See State v. Boling*, 806 S.W.2d 202, 204 (Tenn. App. 1990). Mr. Jackson's attorney did not press the matter after the Reverend Moore stated that he would prefer not to testify regarding the substance of his conversations with Theodore Jackson about his children. Had Mr. Jackson's lawyer insisted on questioning the Reverend Moore, the trial court would have been well advised to obtain more detail from the Reverend Moore regarding the circumstances in which these communications occurred. However, Mr. Jackson's lawyer did not press the matter, and the Reverend Moore's testimony makes it clear that he perceived himself to be God's representative during all his dealings with Theodore Jackson. Accordingly, we find no reversible error regarding the trial court's handling of the clergy-penitent issue.

**III.**

We affirm the judgment dismissing Mr. Jackson's complaint and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal to Cecil Gray Jackson and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.


_____
PATRICIA J. COTTRELL, JUDGE